SPEETER et al. v. UNITED STATES.

No. 8790.

Circuit Court of Appeals, Eighth Circuit.

Aug. 18, 1930.

William F. Donohue, of St. Cloud, Minn., and Arthur LeSueur, of Minneapolis, Minn. (James J. Quigley and Howard I. Donohue, both of St. Cloud, Minn., on the brief), for appellants.

James A. Wharton, Sp. Asst. to Atty. Gen. (Lewis L. Drill, U. S. Atty., of St. Paul, Minn., on the brief), for appellee.

Before KENYON, BOOTH, and GARD-NER, Circuit Judges.

GARDNER, Circuit Judge.

Appellants were indicted in an indictment of three counts, charged with the violation of the Federal Farm Loan Act (39 Stat. 360 [12 USCA § 641 et seq.]). The third count was dismissed at the close of the government's case and may, therefore, be disregarded. The parties will be referred to as they appeared in the lower court. The first count charged the defendants with a violation of section 31 of the Federal Farm Loan Act (12 USCA § 983), in that, while they were in the employ of the Federal Land Bank of St. Paul, Minn., the defendant Martin, as general counsel thereof, and the defendant Speeter, as assistant treasurer thereof, "did wrongfully and unlawfully receive and accept as beneficiaries thereof, a certain sum of money in the amount and of the value of Two Thousand, Four Hundred Ninety-nine and 70/100 Dollars ($2499.70), as a consideration in connection with a certain transaction or business of said bank, which said benefit was received by said John E. Martin and Harry J. Speeter through the transaction and in the manner following to-wit, that said bank was the owner and holder of a Sheriff's Certificate dated April 27, 1925, in the sum of Four Thousand

Nine Hundred Thirty-one and 43/100 Dollars ($4,931.43), on which the period of redemption would expire on April 27, 1926, at which time there would become due and payable on said Sheriff's Certificate the sum of Five Thousand Seven Hundred Eighty-five and 20/100 Dollars ($5,785.20); that on said April 27, 1926, said John E. Martin and Harry J. Speeter by misrepresentation of the facts caused the Executive Committee of said bank and said bank to assign said Sheriff's Certificate to one Oscar Olson for the sum of Thirty-two Hundred Dollars ($3200.00), which said sum was then and there furnished and provided to said Oscar Olson by said John E. Martin and Harry J. Speeter, that said Oscar Olson was then and there in said transaction acting as the agent or 'dummy' of said John E. Martin and Harry J. Speeter; that after the assignment of said Sheriff's Certificate as aforesaid, and within the legal time fixed by the laws of Minnesota, said Sheriff's Certificate was redeemed through the Citizens State Bank of Oslo, Minnesota, by the payment to said 'dummy' Oscar Olson of the sum of Five Thousand Two Hundred Nine and 78/100 Dollars ($5,209.78) and the further payment on or about June 9, 1926, of the sum of Four Hundred Eighty-nine and 92/100 Dollars ($489.92), or a total payment of Five Thousand Six Hundred Ninety-nine and 70/100 Dollars ($5,699.70); that because of said misrepresentation and deceit on the part of said John E. Martin and Harry J. Speeter they became the beneficiaries in the sum of Two Thousand Four Hundred Ninety-nine and 70/100 Dollars ($2,499.70) to the loss and detriment of said bank." The second count was similar to the first, except that it related to a different redemption.

The defendants interposed separate demurrers to the indictment which were overruled, and in response to their demand they were furnished with a bill of particulars. This bill of particulars stated that count 1 was based on a loan made to Olaf H. Paalskaas in the original sum of $5,000, secured by a first mortgage on certain real estate described in the bill of particulars. That the date of the sheriff's certificate was April 27, 1925, and that the time for redemption would expire on April 27, 1926. That redemption was made on or about May 1, 1926, by the Citizens' State Bank of Oslo, Minn., and the foreclosure was for the principal sum remaining due, which at the time of foreclosure amounted to $4,931.43. That the certificate was assigned to Oscar O. Olson, April 27th,

1926, for $3,200. That it was the duty of the defendants to make and cause to be made disposition, advantageously to the bank, of the farm properties acquired by it or of the sheriff's certificates acquired by the bank in the foreclosure, to secure as good a price as possible therefor, and to advise the executive committee and the board of directors of the bank of all the facts in relation to any sheriff's certificate legally acquired by the bank, and to withhold no information to which the directors or the executive committee of the bank were entitled. That the misrepresentation of facts alleged in count 1 were the withholding from the executive committee and the board of directors of the name of the real purchaser of the sheriff's certificate, and the failure on the part of the defendants to disclose to the executive committee or the board of directors facts which the defendants knew, or by due diligence could have known, as to whether redemption would be made under said sheriff's certificate. A similar bill of particulars was furnished as to count 2.

When the case was called for trial, the defendants interposed a motion to compel the government to elect whether it would proceed under paragraph 3 of the Federal Farm Loan Act, or whether it would proceed on the charges of fraud and deceit contained in the indictment. This motion was denied.

The statute under which the indictment was drawn, as announced by counsel for the government at the opening of the trial, was section 31 of the Federal Farm Loan Act (section 983, 12 USCA), which, so far as material to the issues here involved, reads as follows:

"§ 983. Charging or receiving unauthorized fee or commission; disclosing names of borrowers. Other than the usual salary or director's fee paid to any officer, director, or employee of a national farm loan association, a Federal land bank, or a joint-stock land bank, and other than a reasonable fee paid by such association or bank to any officer, director, attorney, or employee for services rendered, no officer, director, attorney, or employee of an association or bank organized under this chapter shall be a beneficiary of or receive, directly or indirectly, any fee, commission, gift, or other consideration for or in connection with any transaction or business of such association or bank. No land bank or national farm loan association organized under this chapter shall charge or receive any fee, commission, bonus, gift, or other consideration not herein specifically authorized."

█ Taking count 1 as typical, it appears from the record that, on the trial, the evidence produced tended to prove: That the Federal Land Bank of St. Paul had foreclosed a mortgage on land in Marshall county, Minn., and that on that foreclosure a sheriff's certificate of sale issued to it dated April 27, 1925, showing the amount for which the property was sold to be $4,931.43; that the year of redemption under the Minnesota law would expire as to the mortgagor, April 27, 1926, and that the amount required to redeem at that time would be $5,785.20; that on April 27, 1926, this sheriff's certificate was sold by the bank and assigned to one Oscar Olson for the sum of $3,200. That the purchase was in fact made by the defendants John E. Martin and Harry J. Speeter, but the assignment was taken in the name of Olson, who had authorized the use of his name. That this method of purchase had been approved by one of the officers of the bank. That the bank had a contract made originally with T. O. Ofsthun, but by him assigned to the Midwest Farms Company, by the terms of which the Midwest Farms Company had agreed to take from the bank, and the bank had agreed to sell and transfer to it, all sheriff's certificates of foreclosure sale owned by the bank at 50 per cent. of the face amount thereof, and that, whenever redemption had not been made from any particular sheriff's certificate of sale by midnight of the last day of the year of redemption, the Midwest Farms Company, under this contract, became entitled to purchase the same. Presumably this arrangement was to prevent the bank from getting its capital so largely invested in lands which were in the nature of frozen assets that it could not function. That in relation to the sheriff's certificate described in count 1, which was purchased by Olson on the last day of the year of redemption, there was a second mortgagee, and this second mortgagee, as was its right under the Minnesota statute, within five days next succeeding the expiration of the year of redemption, redeemed and paid $5,699.70, which was the legal amount necessary to perfect redemption. That the difference between the amount paid by the defendants to the bank for the sheriff's certificate and the amount received on redemption therefrom was divided between the two defendants.

The evidence as to the charge contained in the second count was of the same general character, and, in the view we take of the case, need not be differentiated from that received in support of the charge contained in count 1. The evidence showed, among other things, that the correspondence and papers relating to that certificate were kept in a separate file, and that the bank officers had access thereto, and that one of them at least was fully acquainted with the contents thereof. The sale of the sheriff's certificate in the second count was specifically brought to the attention of Mr. Paul A. Preus, an active officer and member of the executive committee of the bank, and all details were known to him; he took the folder or file, and after examination placed his O. K. thereon and returned it, saying that it was satisfactory and had been approved. The bank officers knew that there were subsequent lienholders who were entitled to make redemption, and it was recognized by the officers of the bank, including Mr. Preus, that redemption money paid by anyone other than the original mortgagor could not come to the bank, but under the contract with the Midwest Farms Company, above referred to, would go to that company. The amount paid to the bank by the defendants for these sheriff's certificates exceeded 50 per cent. of their face value, so that the transaction as consummated resulted in financial advantage to the bank. It also, as has been observed, resulted in substantial financial advantage or profit to the defendants. The title to the certificates was taken in the name of Olson at the suggestion of an officer of the bank, with the thought, apparently, that the Midwest Farms Company might raise objection if it knew that these certificates were being purchased by employees of the bank, thereby depriving the Midwest Farms Company of profits which it would otherwise have received. In this state of the evidence the court denied the motion of the defendants for a directed verdict and sent the case to the jury under instructions of which the following form pertinent parts:

"The Sheriff's Certificates in question here, the evidence indicates, were certificates taken in the ordinary course of the business of the Federal Land Bank. They were assets of the bank. The bank had the right to dispose of them. They were a part of the lawful transactions and business of that bank. It is the claim of the Government that in buying these certificates for less than the amount due upon them in case of redemption, the defendants necessarily received a consideration and a benefit in connection with the transactions and business of the bank. * * * Any salaried employee or officer of a Federal Land Bank who purchases from the bank any of its assets, obtained in the ordinary course of its transactions and business, for the purpose of

making a personal profit, and who actually makes or receives a profit out of the transaction, violates the law which I have given you. A salaried employee might buy a certificate of mortgage foreclosure sale, obtained in the usual and ordinary course of business of the bank for the full amount which would be due upon it in case of redemption, and then receive the amount which was paid for its redemption, for in that case it could truthfully be said that he had received no benefit or consideration in connection with that business of the bank. It is obvious that the purpose of the law is to prevent the employees or officers of such a bank from making personal profits from the business and transactions of the bank, and from putting their own interests ahead of the interests of the institution by which they are employed. It is an old principle that no man can serve two masters; that he cannot serve himself and his employer in connection with his employer's business. This law says in effect, that whatever benefits are to grow out of the business of a Federal Land Bank shall belong to the bank, and shall not be shared with its employees, directly or indirectly, and it forbids the employees from taking pecuniary profits from the bank's business, to the end that they shall be interested solely in its best interests. It is of no consequence whether what these defendants did, was done with good motives or bad motives; whether it was done deceitfully or openly; whether they considered that they had a right to do what they did, or whether they thought otherwise. It is also immaterial whether the bank lost money or whether it did not. The question is, did these employees benefit or receive any consideration directly or indirectly, from any transaction or business of the bank."

In giving these instructions, the court disregarded as surplusage all allegations of the indictment and bill of particulars as to fraud, deceit, and misrepresentation, and swept away as immaterial all the evidence that was introduced on behalf of the government in support of these charges, and likewise all evidence introduced on behalf of the defendants tending to show that the transactions challenged by this indictment were had by the defendants with the knowledge and approval of the officers of the bank, all evidence tending to show that the defendants had no intention to harm or injure the bank, and, finally, all evidence tending to show that none of the profits which the defendants received on the redemption could, in any event, have gone to the bank. Under these instructions, the defendants must have been found guilty,

even though the jury believed they purchased these certificates in absolute good faith on the invitation or request of the officers of the bank, and for the purpose of securing to the bank more money than it would otherwise have received, and without any expectation that redemption would in fact be made. According to the instructions given, the crime consisted in receiving a benefit or making a profit from any transaction or business of the bank. The transaction with the bank consisted in a purchase of these certificates at a price in excess of that which the bank could receive from any other source. So far as the transactions with the bank are concerned, they there ended. Before any benefit or profit could result, it was necessary that at least one more transaction take place, and that was a redemption by a junior lienor. Under the instructions given, it was immaterial whether the defendants knew or did not know that a redemption would be made, but, if a redemption in fact were made, even though the defendants may have believed it would not be made, still they would have been guilty. Clearly, in the absence of collusion or fraud, the transaction by which redemption was made, was not a transaction or business of the bank. It might well be that, if the transaction were fraudulent and collusive and made with the knowledge, through prearrangement, that redemption would be made, such a transaction might properly be held to be a transaction of the bank; in other words, the purchase of the certificate would be a mere subterfuge for the purpose of enabling the defendants to receive a benefit or profit for a bank transaction. But in the absence of any such fraud, collusion, or prearrangement, the subsequent redemption, not being in contemplation of the parties, was not a transaction of the bank, and the transaction by which the defendants purchased the certificates, being a legitimate one when made, could not become criminal by reason of a subsequent transaction not with the bank, nor for the bank, made in good faith.

■ This statute, in so far as it attempts to define criminal offenses, is somewhat obscure, and it is difficult to arrive at the legislative intent and to determine whether the acts charged in this indictment fall within the intended inhibition of the statute. The offense created was not a crime at common law, and, hence, no assistance in the interpretation of the statute can be had by resort to the common law. There being no common law crime against the government, each case, of necessity, involves the construction of a

federal statute, and no one can be punished for crime against the United States unless facts shown plainly and unmistakably constitute an offense within the meaning of an Act of Congress. Donnelley v. United States, 276 U. S. 505, 48 S. Ct. 400, 72 L. Ed. 676; United States v. Lacher, 134 U. S. 624, 10 S. Ct. 625, 33 L. Ed. 1080; Fasulo v. United States, 272 U. S. 620, 47 S. Ct. 200, 202, 71 L. Ed. 443. It has long been the rule of both the national and state courts that penal statutes are subject to the rule of strict construction, and, if a penal statute contains a patent ambiguity and admits of two reasonable and contradictory constructions, that which operates in favor of a party accused under its provisions is to be preferred, and the statute will not be extended in its scope to include other offenses than those which are clearly described and provided for. As said by this court in an opinion by Judge Sanborn in First National Bank of Anamoose v. United States, 206 F. 374, 376, 46 L. R. A. (N. S.) 1139:

"A penal statute which creates a new crime and prescribes its punishment must clearly state the persons and acts denounced. A person who, or an act which, is not by the expressed terms of the law clearly within the class of persons, or within the class of acts, it denounces will not sustain a conviction thereunder. One ought not to be punished for a new offense unless he and his act fall plainly within the class of persons or the class of acts condemned by the statute. An act which is not clearly an offense by the expressed will of the legislative department before it was done may not be lawfully or justly made so by construction after it is committed, either by the interpolation of expressions or by the expunging of some of its words by the judiciary."

In United States v. Chase, 135 U. S. 255, 10 S. Ct. 756, 758, 34 L. Ed. 117, the defendant was indicted under an act declaring that "every * * * book, pamphlet, picture, paper, writing, print, or other publication of an indecent character" was unmailable, and the question under consideration was whether or not to send an obscene letter by mail violated that section. In holding that the letter was not a writing within the meaning of the statute, the court said:

"We recognize the value of the rule of construing statutes with reference to the evil they were designed to suppress as an important aid in ascertaining the meaning of language in them which is ambiguous and equally susceptible of conflicting constructions. But this court has repeatedly held that this rule does not apply to instances which are not embraced in the language employed in the statute, or implied from a fair interpretation of its context, even though they may involve the same mischief which the statute was designed to suppress."

In Fasulo v. United States, supra, in an opinion by Mr. Justice Butler, it is said: "There are no constructive offenses; and, before one can be punished, it must be shown that his case is plainly within the statute."

In Gesell v. United States, 1 F. (2d) 283, 286, decided by this court, it is said: "And we must not lose sight here of the fact that we are dealing with criminal statutes, and that in those portions of their contexts which define the offenses they should be strictly construed."

With these principles and rules of construction in mind, let us turn to the provisions of the statute under consideration. It should be construed, if possible, to give effect to the legislative intent, if that can fairly and reasonably be ascertained. It is first to be noted that the title to this act is as follows: "Charging or receiving unauthorized fee or commission." 12 USCA § 983. This does not indicate any purpose to embody in the statute a provision fixing a penalty for officers or employees participating in transactions with the bank. The act prohibits an officer or employee receiving for services rendered any compensation or consideration other than that paid him directly as salary or fees. It seems fairly clear that it was the purpose of this statute to protect the borrower from any charges in form of commissions or fees charged, levied, or exacted by officers or employees of the bank. Not only does the act prohibit the exaction of such charges by the officers or employees of the bank, but it contains the additional provision that the bank itself shall not "charge or receive any fee, commission, bonus, gift, or other consideration not herein specifically authorized." This provision is significant, and we think it indicates the character of the acts intended to be characterized as criminal. These acts were inhibited whether committed by officers, employees, or by the bank itself, and they all refer to transactions between the bank and its patrons. Nowhere in this statute will be found any expression appropriately describing any transaction between the employee and the bank itself; while, on the other hand, it seems fairly

clear that the statute is dealing with and refers to the business of the bank with its customers. As to this business, the officers and employees are forbidden to receive anything, either from the bank or from any one else in connection with a transaction between the bank and a third person, by way of compensation or reward, except their regular salary or fees. The statute was intended, we think, to prevent abuses of this sort. In the instant case, the defendants received neither a fee, a commisson, a gift, nor a bonus, for any transaction between the bank and a third person. The bank owned these two sheriff's certificates, which it was endeavoring to sell and which the defendants purchased. Whether it was in good form or ethical for these employees to deal directly with the bank, or whether the profit which they received from the transaction should be accounted for to the bank, is not here material. The question is whether or not these acts, under this statute, constitute a crime. There is nothing in the statute which prohibits the employees of the bank from becoming purchasers of these certificates. In effect, the government admits that it was perfectly proper for the defendants to make these purchases, and that the transaction became criminal only in the event that the purchases turned out to be profitable. This seems to be a strained construction of the statute in an attempt to cover such a transaction, whereas, clearly the statute would cover the receipt by an officer or employee of a commission, fee, or a consideration in addition to his salary or fee due him for any transaction between the bank and its patrons, which is quite a different character of transaction from that involved in this case. The bank was in no way interested, as we have already pointed out, in this transaction resulting in the redemption from the mortgage foreclosure sale by a second mortgagee. It had parted with its sheriff's certificate, and could not in any event have been the recipient of the redemption money from the second mortgagee, because, under its contract with the Midwest Farms Company, the certificates involved went to that company before redemption could be made by the second mortgagees. We are therefore of the view that the facts proved do not constitute the offense described in this statute.

It follows that the lower court was in error in its instructions to the jury and in denying defendants' motion for a directed verdict. The judgment of the lower court is therefore reversed and the case remanded for further proceedings consistent herewith.